# Illinois Official Reports

## Appellate Court

---

### *People v. Ealy*, 2019 IL App (1st) 161575

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. COURTNEY EALY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-1575 |
| Filed | May 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-06853-02; the Hon. Vincent Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael T. Mulligan, of Mulligan Law, LLC, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Christine Cook, and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Lavin and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Courtney Ealy, and his codefendant, Clint Massey, were convicted of murder in the shooting death of Javan Boyd. The State's evidence showed that Boyd, a taxi driver, was waiting for his fare when Ealy and Massey, as shown on security camera video, approached the taxi and shot Boyd. On appeal, Ealy argues that (i) the evidence was insufficient to convict him of murder, (ii) the State's improper comments deprived him of a fair trial, (iii) his right to a speedy trial was violated, and (iv) his 38-year sentence was excessive. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On the night of February 21, 2014, defendants attended a party at 39th Street and Wentworth Avenue in the Wentworth Gardens housing project. Ealy wore a Burberry shirt and white pants, and Massey wore a tiger-striped jogging suit. Also attending the party were Kaprice Johns, Jasmine Brown, Germontay Carpenter, T'Keyah Herbert, and Jerome Anderson.

¶ 4    Defendants left the party with Herbert in Herbert's van.[1] After they left, Johns, who remained at the party, got into an argument with a group of women known as "Pretty in Pink" because Johns disliked the song that was being played. As they argued, someone fired a gun into the air multiple times. Johns did not see who fired the shots, but she guessed that the shooter wanted to stop the argument because it was too loud. The gunshots did not hit anyone.

¶ 5    After the altercation, Johns left the party with Brown, Carpenter, and Anderson. They left in Johns's car, with Anderson driving. Carpenter made a phone call to either Ealy or Massey, who were still with Herbert in her van, and told them about the altercation at the party. Carpenter put the call on speakerphone, and Brown could hear Ealy's voice, which she recognized, on the other end.

¶ 6    Anderson drove to Wendy's, where they met up with a red car and Herbert's van. Ealy and Massey exited the van and got into the red car, along with a man named D-Rose. (A fourth man, unidentified at trial, was the driver.) The three vehicles drove back toward Wentworth Gardens in a convoy: first the red car, then Herbert's van, then Johns's car. According to Johns, they intended to "see who shot at [them]" and "deal with the matter."

¶ 7    Meanwhile, Latoya Adams was visiting her mother in Wentworth Gardens. Around 3 a.m. on the morning of February 22, she called for a taxi to go to a friend's house. Javan Boyd was dispatched to the call.

¶ 8    As the three-vehicle convoy approached 38th Street and Princeton Avenue, they passed Boyd sitting in his parked car, waiting to pick up Adams. The three vehicles all made a U-turn and came to a stop. Ealy, Massey, and D-Rose disembarked from the red car and approached Boyd's car from the passenger side.

¶ 9    Both Johns and Herbert witnessed the shooting. According to Johns, Ealy and Massey were standing next to each other, with D-Rose behind them. Ealy and Massey spoke to Boyd, and

---

[1]At trial, Herbert admitted attending the party, but she denied seeing defendants at the party or knowing anything about the shooting. She was impeached with a signed statement she made to Assistant State's Attorney (ASA) Patrick Waller on March 4, 2014, which was admitted as substantive evidence. See 725 ILCS 5/115-10.1 (West 2014).

then Johns saw "a light flash from the gun" and Boyd "jumping" as if he was getting shot. At trial, Johns said she did not see the actual gun, but in a prior statement to detectives, Johns identified Ealy as the shooter. After the shooting, D-Rose ran back to Johns's car and got inside, saying "sh**" and "he's dead." Ealy and Massey ran back to one of the other vehicles, and all three vehicles drove away. As they left, Johns could see Boyd "slumped over" in his car.

¶ 10 Herbert saw Ealy and Massey open Boyd's passenger-side door and then saw Massey firing a gun into the car. She heard four or five gunshots, after which Ealy and Massey returned to the red car and drove away.

¶ 11 The shooting was captured on surveillance cameras belonging to the Chicago Housing Authority (CHA), which owns the Wentworth Gardens housing project. The video footage was played for the jury. In the videos, three vehicles drove past Boyd's taxi and then came driving back the other way. The convoy leader, a red car, stopped next to Boyd's taxi and two men got out, one wearing a striped track suit (Massey) and the other wearing a brown shirt and white pants (Ealy). They approached Boyd's car from the front passenger side and appeared to be talking to him. Boyd's taxi started backing up, but hit a vehicle parked a couple of feet behind him. (At this point, D-Rose got out of the red car and ran back toward Johns's car.) There was a bright flash of light near Ealy's hand; Boyd's car surged forward and hit another parked car in front. Ealy and Massey ran forward to look in the front passenger window. Ealy returned to the red car, Massey followed him a few moments later, and the three vehicles drove away.

¶ 12 Adams came outside to pick up her taxi and found Boyd hanging out of the driver's side of his car. She asked him if he was okay. He did not respond. Someone else had already called the police, so Adams called the taxi company to inform them that their driver had been shot. She then remained at the scene and cooperated with police when they arrived.

¶ 13 After leaving the scene of the shooting, Johns dropped Anderson off at his house and then drove to the Shell gas station at 55th Street. Ealy was waiting there. He entered Johns's car, told her that he dropped his iPhone at the scene, and asked her to help him retrieve it. Brown said that it was stupid to go back, but Johns agreed to do it. On the way there, Ealy spoke about the shooting. He said that he asked the victim if he was "from over here" and specified the part of Wentworth Gardens where the party had been. The victim said he was. Ealy also said "man down," which Johns understood to mean the victim was dead.

¶ 14 By the time Johns returned to the scene of the crime, police had already cordoned off the area. Johns parked the car and approached on foot. She told officer Chris Martin that she had dropped her phone nearby and asked whether she could retrieve it. Martin refused, explaining that it was a crime scene.

¶ 15 Johns returned to her car and drove closer to the crime scene. While in the car, she spoke with Sergeant Arthur Young. She gave him a fake name ("Brianna Johns") and also a fake story, telling him that she was driving in the area when she heard several gunshots and saw a man with braided hair and a dark sweater near the victim's car; she got scared and dropped her phone near the victim's car. Johns then gave Young the phone number. Although Johns did not have Ealy's number memorized, Ealy told her the number as she was speaking to Young. At trial, Johns recalled that the number began with "773-803."

¶ 16 Officers did, in fact, find an iPhone in the middle of the street near the victim's vehicle. Pursuant to a search warrant, detectives conducted data extraction on the phone, which

revealed that its number was 773-809-****. The phone was also swabbed for DNA; testing revealed a mixture of at least three DNA profiles that were not suitable for comparison.

¶ 17 A latent fingerprint impression recovered from Boyd's passenger side window was identified as belonging to Ealy. Inside Boyd's car, the police recovered three 9-millimeter fired cartridge casings and two 9-millimeter fired bullets; additionally, the medical examiner recovered two more 9-millimeter bullets from Boyd's chest. Kellen Hunter, a firearms examiner for the Illinois State Police, determined that the bullets were all fired from a single gun, and the cartridge casings were all fired from a single gun. He was unable to determine whether the bullets and cartridges were fired from the same gun, since it is impossible to match a fired bullet to a fired cartridge casing. He also could not determine what kind of gun they were fired from, since both 9-millimeter revolvers and 9-millimeter semi-automatic weapons exist.

¶ 18 Ealy moved to sever his trial from Massey's. Massey did not move for severance. After a hearing, the motion was denied. Ealy and Massey were tried together before a jury. For both defendants, the State sought a conviction for first degree murder and a 15-year sentence enhancement for being "armed with a firearm" during the commission of the offense. The jury was instructed concerning accountability as to both the murder and the firearm allegation. Specifically, for the firearm allegation, the jury was instructed to determine whether "the defendant, Courtney Ealy, or one for whose conduct he is legally responsible was armed with a firearm."

¶ 19 The jury found both defendants guilty of first degree murder, but it found that the firearm allegation was proven only as to Massey. Following a sentencing hearing, the trial court sentenced Ealy to 38 years' imprisonment.

¶ 20 II. ANALYSIS

¶ 21 Ealy argues that (i) the evidence was insufficient to convict him of first degree murder, (ii) his right to a fair trial was violated by improper prosecutorial comments during opening and closing arguments, (iii) his right to a speedy trial was violated, and (iv) his 38-year sentence was excessive. We consider these arguments in turn.

¶ 22 A. Sufficiency of the Evidence

¶ 23 Ealy's first contention is that the evidence was insufficient to convict him of first degree murder. Specifically, he argues that the State failed to prove the intent necessary to hold him accountable for Massey's actions. The State disagrees and additionally argues that we need not limit our review to evidence of accountability, since the evidence was also sufficient to prove Ealy guilty directly.

¶ 24 It is well settled that a general verdict of guilty will not be invalidated on evidentiary grounds as long as sufficient evidence exists to support any grounds for conviction submitted to the jury. *Griffin v. United States*, 502 U.S. 46, 49-50 (1991). When reviewing the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Rather, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 25    Initially, the State points out that it did not seek to convict Ealy solely on a theory of accountability. Rather, since the evidence was in conflict as to which defendant was the shooter, the State argued that "[i]t doesn't matter who shot that gun that killed Javan Boyd, because *** [t]he law of accountability tells you that it is as if each of them had their finger on the trigger and pulled it." Ealy nevertheless argues that the jury's verdict—finding him guilty of murder but also finding that the firearm allegation was not proven—necessarily means that the jury found him guilty on a theory of accountability. We disagree. In fact, the jury's findings are irreconcilable regardless of the theory of guilt adopted. If the jury believed that Ealy was the shooter, then the jury should have found the firearm enhancement proven as to him. If, on the other hand, the jury believed Massey was the shooter, then the jury must have found Ealy to be accountable for Massey's actions and, therefore, should have found the firearm allegation proven under a theory of accountability. See *People v. Rodriguez*, 229 Ill. 2d 285, 293-94 (2008) (15-year sentence enhancement for being "armed with a firearm" applies to unarmed defendant who aids and abets armed defendant).[2]

¶ 26    But this inconsistency—whether the product of juror lenity, compromise, or some other unknowable reason—cannot be used to attack Ealy's conviction. Our supreme court has made clear that "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003); see also *People v. Reed*, 396 Ill. App. 3d 636, 648 (2009) (defendant cannot challenge conviction based on an inconsistent answer to a special interrogatory); *People v. Jackson*, 372 Ill. App. 3d 605, 612 (2007) (courts will not use a jury's response to a sentence enhancement inquiry for any purpose other than sentence enhancement). "[E]ven with legally inconsistent findings, sufficiency-of-the-evidence review is a sufficient safeguard against jury irrationality." *Reed*, 396 Ill. App. 3d at 648.

¶ 27    Here, the evidence was sufficient to convict Ealy of first degree murder either as a principal or an accomplice. As noted, there was conflicting evidence at trial as to who shot Boyd: Johns testified that she did not see the murder weapon, but she acknowledged that she identified Ealy as the shooter to police. On the other hand, Herbert identified Massey as the shooter in her written statement to ASA Waller. It was the jury's responsibility to assess the credibility of witnesses, determine the weight to give their testimony, and resolve conflicts or inconsistencies in the evidence. *Jackson*, 232 Ill. 2d at 280-81. The jury could reasonably have believed Johns's identification of Ealy and found him guilty based on his own conduct.

¶ 28    Ealy argues that Johns's identification was uncorroborated by any trial testimony. But "recanted prior inconsistent statements can be sufficient to support a conviction, even without corroborating evidence." *People v. Cox*, 377 Ill. App. 3d 690, 700 (2007) (citing *People v. Thomas*, 354 Ill. App. 3d 868, 880 (2004), *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002), and *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998)). Ealy also argues that Johns was not a credible witness because (i) she lied to police when trying to retrieve Ealy's phone from the scene of the crime and (ii) she made her statement to police while in custody on unrelated

---

[2]By contrast, the 20- and 25-year firearm enhancements apply only to defendants who "personally discharged" a firearm and, therefore, cannot be found on a theory of accountability. *Rodriguez*, 229 Ill. 2d at 294-95. According to the State, because it was unclear whether Ealy or Massey (or both) shot Boyd, it chose not to seek the 20- and 25-year enhancements for defendants.

charges. Ealy is, in effect, inviting us to substitute our judgment regarding Johns's credibility for that of the jury, which we will not do. See *Jackson*, 232 Ill. 2d at 280-81.

¶ 29 Ealy next argues that the CHA surveillance video demonstrates conclusively that he was not the shooter. We disagree. The video is of insufficient quality to determine which defendant is holding the gun at any given time, but, notably, a bright light resembling a muzzle flash can be seen coming from Ealy's hand immediately before Boyd's car lurches forward. Nor do we find it significant that Ealy returned to the red car before Massey, since the shooting could have been over by that point or, as the State argues, Ealy could have given the gun to Massey who continued firing into the taxi. Accordingly, the evidence was sufficient for a reasonable jury to conclude that Ealy shot Boyd.

¶ 30 Although this is by itself enough to support the verdict (see *Griffin*, 502 U.S. at 49 ("if there is any one count to support the verdict, it shall stand good, notwithstanding all the rest are bad" (internal quotation marks omitted))), there also was sufficient evidence to find Ealy guilty on a theory of accountability. A person is legally accountable for the criminal conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). To establish the requisite intent, the State must prove that the defendant shared the principal's criminal intent or there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Where a common criminal design is alleged, " '[e]vidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another.' " *People v. Fernandez*, 2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 338 (1995)).

¶ 31 Here, there was more than sufficient evidence that Ealy joined the convoy returning to Wentworth Gardens for the express purpose of avenging the slight to Johns and her friends. The group's common criminal design was to "see who shot at [them]" and "deal with the matter." Under the circumstances, and particularly in light of what transpired, it is reasonable to infer that the group did not intend to "deal with" the perpetrators in a peaceful or lawful manner.

¶ 32 Additionally, it is undisputed that Ealy and Massey confronted Boyd together. Ealy asked whether Boyd was from "over here," to which Boyd replied that he was; then, according to Herbert, Massey began shooting Boyd. Ealy made no move to stop the shooting, nor did he dissociate himself from the crime after the fact. Rather, he ran back to the red car with Massey, and they fled the scene together. Later, when discussing the shooting with Johns, Ealy displayed no remorse but instead bragged that it was "man down." He did not report the shooting but sent Johns to speak with police in a failed attempt to retrieve his dropped cell phone. All of these facts support an inference that Ealy was acting pursuant to a common criminal design with Massey. See *Perez*, 189 Ill. 2d at 267 ("Proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability.").

¶ 33 Ealy argues that even if he shared a common criminal design to retaliate for the incident at the Wentworth Gardens party, he could not have planned to kill Boyd, who was not connected

to that incident. Indeed, at oral argument, counsel emphasized how apparently irrational it was that Ealy and Massey would exact revenge for the earlier altercation between two groups of women by shooting a man who, as far as they were aware, had not even attended the party. But Boyd was only shot after he agreed (in response to Ealy's query) that he was from "over here," while parked outside a Wentworth Gardens residence. The jury could have concluded that based on Boyd's response, Ealy and Massey believed Boyd was one of the guests at the party and decided to "deal with the matter" by shooting him. Moreover, under a common-design theory, a defendant can be found legally accountable for a crime that he did not specifically intend, as long as his companion committed the crime in furtherance of the intended act. *Fernandez*, 2014 IL 115527, ¶ 21 (citing *People v. Kessler*, 57 Ill. 2d 493, 497 (1974) (defendant could be held accountable for unplanned shootings committed by his initially unarmed companions)). Thus, for all the foregoing reasons, we find the evidence was sufficient to convict Ealy of first degree murder.

¶ 34                                    B. Prosecutorial Comments

¶ 35        Ealy additionally argues that he was deprived of a fair trial because (i) the prosecutor improperly referenced Boyd's family in opening argument and (ii) the prosecutor referred to defendants as "shooters" in closing argument. We apply an abuse of discretion standard in reviewing the trial court's ruling on the propriety of the challenged remarks, and a *de novo* standard in reviewing whether any misconduct was egregious enough to warrant a new trial. *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 61-62.

¶ 36        During opening statements, the prosecutor stated that Boyd "was working as a cab driver. And as a cab driver, this job he did to help support his family." Later in the same argument, the prosecutor stated that Boyd was "trying to earn money for his family." After the State's argument concluded, the experienced trial judge *sua sponte* called a sidebar and asked:

> "THE COURT: Is Mr. Boyd's family any way involved as evidence in this case or the commission of this crime?
>
> THE STATE: No. No.
>
> THE COURT: Then quit mentioning that he has a family. *** Unless it's germane to the trial, you don't mention the victim's family."

Defense counsel, who had not previously objected, then objected to the prosecutor's statements "for the record."

¶ 37        Ealy raised no argument regarding these statements in his posttrial motion. Accordingly, the issue is forfeited (*People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010) (to preserve a claim for review, defendant must both object at trial and raise the issue in his posttrial motion)), and Ealy does not argue plain error. We will therefore honor Ealy's forfeiture. Moreover, we note that the mentions of Boyd's family were brief, not repeated by either party after the court's admonishment, and the court instructed the jury that arguments do not constitute evidence. See *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 64 (prosecutor's improper comment did not warrant reversal where it was brief, the comment was surrounded by proper argument, and the jury was properly instructed that arguments do not constitute evidence).

¶ 38        Ealy next argues that the State erred by referring to him and Massey as "shooters" during closing argument. Specifically, the prosecutor stated that after the altercation at the party, Johns and her friends "left that party and they went to get their shooters, these two." Likewise, in

rebuttal, the prosecutor stated: "You heard that the girls called these two, their shooters, their backup to go back, to retaliate, to take care of business."

¶ 39 This contention of error is also forfeited, since Ealy failed to object or raise the issue in his posttrial motion. *Thompson*, 238 Ill. 2d at 611-12. Ealy acknowledges his forfeiture but argues that we may still consider the issue under the plain error doctrine, which allows us to review "clear and obvious" unpreserved errors when either (i) the evidence is so closely balanced that the error threatened to tip the scales against the defendant, or (ii) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). It is axiomatic that without error, there can be no plain error. *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007); see *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009) (initial step in plain error analysis is to determine whether error occurred at all).

¶ 40 We find no error in the State's characterization of Ealy and Massey as "shooters," since the evidence shows that they did, in fact, shoot Boyd. It is well established that prosecutors are given wide latitude during closing argument and may comment on the evidence and any reasonable inferences arising therefrom, even if those inferences reflect negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The prosecutor's remarks were a fair comment on the evidence that after Carpenter called them to "see who shot at [them]" and "deal with the matter" (to quote Johns), Ealy and Massey returned to Wentworth Gardens and shot Boyd.

¶ 41 Ealy argues that the challenged statements imply that he had a reputation as a shooter or was associated with some group in the role of shooter, neither of which is supported by the record. Viewing the statements in context, as we must (*People v. Ramsey*, 239 Ill. 2d 342, 441 (2010)), we find no such implication; it is apparent that the prosecutor was referencing the shooting of Boyd that occurred later that night. Thus, Ealy's contention of error, plain or otherwise, is without merit.

¶ 42                                     C. Right to a Speedy Trial

¶ 43 Ealy next argues that his right to a speedy trial was violated when the court granted the State's pretrial motion to extend the term for an additional 60 days to enable the State to secure eyewitnesses for trial. Although Ealy forfeited this issue by failing to include it in his posttrial motion, this court has reviewed unpreserved challenges to the extension of the speedy trial term because a speedy trial implicates fundamental constitutional concerns. *People v. McKinney*, 2011 IL App (1st) 100317, ¶ 29.

¶ 44 The Speedy Trial Act provides, in relevant part, that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody." 725 ILCS 5/103-5(a) (West 2014). The trial court may continue the case up to an additional 60 days if it determines that "the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." 725 ILCS 5/103-5(c) (West 2014). The State bears the burden of showing due diligence (*People v. Battles*, 311 Ill. App. 3d 991, 997-98 (2000)), and "[t]he test of due diligence is whether the State began efforts to locate its witness in sufficient time to secure [his or] her presence before the speedy trial term expired" (*People v. Exson*, 384 Ill. App. 3d 794, 799 (2008)). We review

the trial court's decision to grant an extension for an abuse of discretion. *People v. Connors*, 2017 IL App (1st) 162440, ¶ 16.

¶ 45 The record reflects that, starting in July 2015, the State made numerous efforts to locate Carpenter, Johns, and Brown to subpoena them as material witnesses. From July through December, at least eight unsuccessful attempts were made to locate and serve Carpenter. On December 8, on the State's motion, the trial court declared him a material witness and ordered any law enforcement officials who located him to bring him before the court. As for Johns, at least 15 unsuccessful attempts were made to locate and serve her during the same time period. Investigators also contacted various associates of Johns, made multiple attempts to obtain her work address, and sought assistance from the United States Marshal Office Great Lakes Regional Fugitive Task Force, to no avail. Finally, after several unsuccessful attempts, Brown was served on December 12 and ordered to appear for Ealy's trial, which was scheduled for December 28. Meanwhile, Ealy filed a written speedy trial demand on December 4.

¶ 46 On December 28, Brown appeared in court for trial, but Carpenter and Johns had not yet been located. The trial was continued on the State's motion to January 15, 2016, and the court admonished Brown to return on that date. By January 15, Johns had still not been located. Carpenter had been located and served, but neither he nor Brown appeared in court. On the State's motion, the court issued rules to show cause against Carpenter and Brown and also issued warrants for their arrest. Trial was rescheduled for January 22.

¶ 47 On January 20, the State requested, for the first time, leave to obtain a buccal swab from Ealy for DNA testing. Ealy's counsel objected, pointing out that in the unlikely event that the DNA testing results came back before the scheduled trial date, Ealy would not have time to review the results without seeking a continuance, thereby breaking his demand for speedy trial. The trial court acknowledged that it was "late in the game," but granted the State's motion. On January 22, the State again answered not ready for trial due to lack of witnesses.

¶ 48 Ealy's speedy trial period was set to expire on February 17. On February 1, the State moved for a 60-day extension, citing its continued inability to locate witnesses and detailing its unsuccessful efforts to obtain their appearance at trial. Ealy objected, pointing out that the State was still testing the DNA evidence, which would not be available to them if the trial was timely held. The State denied that its reason for seeking an extension was to obtain more time to process the DNA evidence. The court granted the State's motion, saying, "This is one of the most comprehensive searches for witnesses that I have heard." After the extension was granted, both Johns and Brown were taken into custody, and the case proceeded to trial on March 4 (*i.e.*, 15 days into the 60-day extension) without Carpenter.

¶ 49 Based on the record, it is abundantly clear that the trial court acted within its discretion in finding due diligence by the State and in granting the extension. To attempt to secure witnesses for trial, the State engaged in extensive efforts spanning over seven months before the end of the speedy trial window, and over four months before Ealy made his speedy trial demand. See *Exson*, 384 Ill. App. 3d at 799.

¶ 50 Ealy does not challenge the materiality of Carpenter, Johns, and Brown to the State's case. Nor does Ealy challenge the truthfulness of the State's representations regarding the efforts it took to secure those witnesses. Instead, Ealy argues that (i) there were no "reasonable grounds to believe" that Carpenter's testimony could be obtained and (ii) the State did not show due diligence in locating Johns and Brown. Both contentions lack merit. With regard to Carpenter, Ealy makes a conclusory statement that it was "not surprising[ ]" that the State could not find

him, since after being served, he traveled to Atlanta, Georgia. But as the State explained to the court on January 22 and again in its motion for extension of time, United States Marshals, the FBI, and Atlanta law enforcement were all searching for Carpenter. Under those circumstances, it was not an abuse of discretion for the court to find reasonable grounds to believe that Carpenter's testimony could be obtained.

¶ 51    With regard to Johns and Brown, Ealy speculates that the State could easily have secured them within the 120-day period, but deliberately delayed to obtain more time to complete its DNA testing. This speculation has no basis in the record, since the State's efforts to find Johns and Brown are well documented, and DNA testing was not a significant part of the prosecution's case. Accordingly, the trial court did not abuse its discretion in granting the State's motion for an extension of the speedy trial period.

¶ 52                                    D. Sentence

¶ 53    Finally, Ealy argues that his 38-year sentence for first degree murder was excessive in light of his youth (he was 19 at the time of the shooting) and "the fact that he did not shoot the victim."

¶ 54    Although this court may reduce a defendant's sentence under Illinois Supreme Court Rule 615(b)(4), that power should be exercised "cautiously and sparingly." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We review the trial court's sentencing decision for an abuse of discretion (*People v. Hauschild*, 226 Ill. 2d 63, 90 (2007)), keeping in mind that such a decision is entitled to great deference because of the trial court's superior opportunity to observe the defendant and the proceedings. *Alexander*, 239 Ill. 2d at 212 (citing *People v. Stacey*, 193 Ill. 2d 203, 209 (2000), citing *People v. Fern*, 189 Ill. 2d 48, 53 (1999)).

¶ 55    Upon reviewing the record, we find no abuse of discretion by the trial court. Ealy's 38-year sentence was squarely in the middle of the 20-to-60-year sentencing range for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2016)), and the trial court explicitly stated that it took into consideration the appropriate factors in aggravation and mitigation. Ealy is essentially inviting us to reweigh the factors in his favor, which we may not do. See *Alexander*, 239 Ill. 2d at 214-15 (appellate court erred by reweighing sentencing factors to give additional weight to defendant's rehabilitative potential). Moreover, as discussed, it was not proven at trial that Ealy "did not shoot the victim," so Ealy's argument in this regard lacks merit. The trial judge at sentencing could reasonably have believed, consistent with the trial evidence and the jury's general verdict of guilty, that Ealy was the one who fatally shot Boyd.

¶ 56                                   III. CONCLUSION

¶ 57    The judgment of the trial court is affirmed, since (i) the evidence was sufficient to convict Ealy of first degree murder, (ii) the challenged prosecutorial comments do not require reversal because some were fair comments on the evidence and the remainder were not raised in Ealy's posttrial motion, (iii) the trial court acted within its discretion in granting a 60-day extension of the speedy trial period, and (iv) Ealy's 38-year sentence, in the middle of the 20- to-60-year sentencing range, was not excessive.

¶ 58    Affirmed.