2021 IL App (1st) 192517-U

No. 1-19-2517

Order filed October 25, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 60167 |
| | ) | |
| SANDY MILLER, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Walker and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for aggravated home repair fraud is affirmed where the evidence was sufficient to establish his accountability for the offense.

¶ 2    Following a bench trial, the judge found Sandy Miller guilty of aggravated home repair fraud and sentenced him to six years' imprisonment. On appeal, Miller contends the evidence was insufficient to establish his accountability for the offense.

¶ 3    We find the evidence sufficient to establish Miller's accountability for aggravated home repair fraud and affirm.

¶ 4                                  Background

¶ 5    Miller was charged with two counts of aggravated home repair fraud, one of which alleged he, J.R. Miller, and Angelo Miller knowingly entered into an oral agreement for home repair with Gwendolyn Williams, aged 60 or older, and knowingly used deception, false pretenses, or false promises to induce Williams to enter into the agreement, the amount of which exceeded $500 (815 ILCS 515/3(a)(2), 5(i) (West 2016)). The Millers are brothers, and, for clarity, we refer to them by their first names. The other count alleged an oral agreement for home repair with Williams knowing the agreement to be unconscionable (815 ILCS 515/3(a)(3), 5(i) (West 2016)). As Miller only challenges the sufficiency of the evidence establishing his accountability, we recite the trial evidence necessary to decide that offense.

¶ 6    Gwendolyn Williams testified that she was about 70 years old when, from her front porch, she saw a truck drive slowly past her house twice. Miller, whom Williams identified in court, was driving. On the second pass, she waved at the truck, and Miller asked if she had any work. Williams "told him to come," the truck stopped, and three men got out.

¶ 7    J.R. Miller approached Williams and said it "look[ed] like she needed some work done." Williams said she would "like to have one of those things on [her] chimney that the birds couldn't get in," and her sidewalk needed repair. J.R. "said okay, he could take care of that," and "said oh, about three," which Williams took to mean $300 for the job. J.R. also quoted her $400.

¶ 8    When Williams mentioned her chimney, J.R. said something "not in English" to Miller, and Miller "got on a ladder and he went up and said lot of work." Miller and J.R. spoke to each

other in a language Williams could not understand. J.R. then told Williams the price had changed because concrete cost $90 per pound. Miller was not present for this conversation; he was working on the chimney. The third man was not present, either; he worked on "the side of the house." J.R. gave Williams a receipt, asked her to write down her contact information, and told her he was "gonna warranty this for 25 years." He initially wrote what appeared to be "$300" on the receipt, which Williams understood to be the price of the job. J.R. told her he would give her a deal on the per-pound cost of concrete. He then crossed out $300 on the receipt and wrote $3,100.

¶ 9    Williams identified the receipt, which the State moved into evidence. The receipt is dated "6/24/16" and contains Williams's contact information. The work proposed is "[a]ll work for 25 years foundation & chim work." Several numbers are handwritten on the receipt, including what looks like "$300" crossed out, "$2800," and "$3100." "Paid in full" appears handwritten twice on the receipt. Williams testified she did not write "$3100" or "Paid in full" on the receipt. No one signed in a box labeled "ACCEPTANCE OF PROPOSAL" at the bottom of the receipt.

¶ 10    Miller and his codefendants were at Williams's house for 25 to 30 minutes total, and Miller spent 15 to 20 minutes working on the chimney. None of the defendants mentioned returning to finish. J.R. told Williams he had another job, so she had to pay "right away," even though Miller had not put the device she requested on her chimney. Miller told J.R. she had to go to the bank to pay him. She intended to pay $3,100 because she "had already committed [her]self," even though the price was "a little much," and she "still [didn't] have the thingy on [her] chimney."

¶ 11    Williams and her husband drove to a bank in Oak Lawn and, en route, she noticed Miller's truck following her. Williams identified Miller's truck in a photograph, which the court entered

into evidence. This photograph depicts a pickup truck with signs that advertise home repair services, including chimney repair, masonry, tuckpointing, and roofing.

¶ 12    Williams had not told Miller to follow her to the bank and thought it was "weird" when she saw his truck. In the bank parking lot, Miller parked the truck in front of Williams's car. Williams asked Miller to whom her check should be made, and he said, "I have to call," and acted as though he did not understand English. Miller telephoned someone. A police officer came toward Williams, and she mouthed the word "help." Williams told the officer "about the agreement that was made between [her]self, J.R., and [Miller] and others," and gave him the receipt. She identified Miller and told the officer she was trying to write a check for work he had done.

¶ 13    On cross-examination, Williams testified she never discussed the work to be performed or a price with Miller. Nor did Miller fill out the receipt, give her a receipt, or discuss payment with her. Miller stood behind J.R. when Williams agreed to pay $300 to $400 for the work. J.R. "seemed to be the boss," and Miller "did what J.R. told him to do."

¶ 14    Williams never agreed to pay $3,100 and was "shocked" when J.R. wrote that amount on the receipt. At the bank, she intended to get a cashier's check, and the only reason she did not was that she hadn't been told to whom to write the check. Williams did not give the men any money.

¶ 15    On the day of the incident, Oak Lawn detective Michael McNeela testified he saw a white Ford pickup truck with "multiple signs, different advertisements on it about roofing and tuckpointing" in a retail parking lot. The truck had no front license plate, and its rear license plate was not legible. McNeela identified the truck in the photograph the State had moved into evidence.

¶ 16    McNeela approached the truck on foot and saw Miller, whom he identified, in the driver's seat. The truck's passenger-side door was open, and Angelo Miller was leaning into a sedan parked

next to the truck, speaking to Williams and her husband. McNeela made eye contact with Williams and saw her mouth "help." She looked "distressed," "uncomfortable, and a little shaken."

¶ 17    McNeela spoke to Williams, who gave him the receipt and identified Miller; she "pointed directly at him and said that he was the one that got out on the roof *** before [she] agreed to work being done." Williams told McNeela "exactly what had happened earlier in the day and what had led her to the bank." McNeela arrested Miller, Angelo, and J.R..

¶ 18    Chicago police detective William Donnelly testified he interviewed Miller in a lockup after giving him *Miranda* warnings. Miller said, "he was flagged down by Ms. Williams and asked to do some chimney repair work. Specifically, she was looking for a cap and a liner to be put on the chimney." Miller added, "the cap and the products that [were] needed [were] never purchased nor was it installed." Miller said he and other men followed Williams to the bank to get paid. Miller initially said he expected to make $110, then said he would make $40 to $50 for his labor.

¶ 19    Donnelly contacted Christopher Domina of Dynamic Building Restoration and asked him to examine Williams's house. Domina was qualified as an expert in the field of mason contracting. Domina testified that he examined Williams's house at the request of police. The tuckpointing of the chimney was "not done per standard." Correctly done, it would take two men about four hours. The chimney had a concrete cap, not a metal cap. The joint of the house and sidewalk had been sealed improperly using mortar instead of a urethane sealant. The work on Williams's house was worth about $200, including labor, not $3,100. Domina described $3,100 as "astronomical for the work." And, he had never heard of concrete being priced by the pound.

¶ 20    In closing, the State argued Miller participated in a scheme to defraud and take advantage of an elderly person. The court characterized Miller's work on Williams's chimney as "worthless" and found "[i]n essence really nothing was done, nothing that would be considered home repair."

¶ 21    Miller filed a motion for new trial, which argued, in relevant part, that the State failed to prove he was accountable for J.R.'s actions. The court denied this motion, describing this as a "classic accountability case" and characterizing Miller's role in the fraud as attempting to "justify the outrageous nature of the charges" "for doing next to nothing."

¶ 22    The court merged the count of aggravated home repair premised on an unconscionable agreement into the count premised on the use of false pretenses and sentenced Miller to six years' imprisonment.

¶ 23                                    Analysis

¶ 24    On appeal, Miller challenges his conviction for aggravated home repair fraud. Specifically, Miller contends the State failed to prove his accountability where the evidence was insufficient to establish he shared J.R. Miller's intent or was part of a common criminal design to commit the offense.

¶ 25    "Upon review of a question as to a defendant's accountability for an offense, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Fernandez*, 2014 IL 115527, ¶ 13. We do not retry a defendant, nor substitute our judgment for the trier of fact concerning the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 223 Ill.2d 187, 242 (2006). We will only reverse the conviction

if the evidence is so improbable, unreasonable, or unsatisfactory to justify a reasonable doubt of the guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 26 A person commits home repair fraud when they knowingly enter into an oral or written agreement or contract for home repair with another person and uses deception, false pretenses, or false promises to induce the person to enter into the agreement. 815 ILCS 515/3(a)(2) (West 2016). A person commits aggravated home repair fraud they commit home repair fraud against a person 60 years of age or older. 815 ILCS 515/5(i) (West 2016); 720 ILCS 5/17-56(c)(1) (West 2016).

¶ 27 To hold Miller accountable for aggravated home repair fraud, the State had to establish that, either before or during the commission of the offense, and with the intent to promote or facilitate commission, he solicited, aided, abetted, agreed, or attempted to aid in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 2016). To prove Miller possessed the intent to promote or facilitate the crime, the State could present evidence showing either (i) Miller shared his codefendants' criminal intent, or (ii) Miller and his codefendants had a common criminal design. See *Fernandez*, 2014 IL 115527, ¶ 21.

¶ 28 "Under the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Id.*, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)). " 'Evidence that a defendant voluntarily attached himself [or herself] to a group bent on illegal acts with knowledge of its design supports an inference that he [or she] shared the common purpose and will sustain [] conviction for an offense committed by another.' " *Id.* (quoting *In re W.C.*, 167 Ill. 2d at 338). Explicit words of agreement are not required; instead, a common criminal

design may be inferred from the surrounding circumstances. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. Evidence of the defendant's presence during the offense, close affiliation with their companions after the offense, and failure to report the offense comprise factors the trier of fact may consider in determining the defendant's accountability. *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 32. Accountability does not require proof of a preconceived plan if the evidence indicates the defendant was involved in the spontaneous acts of the group, and it does not require proof of active participation in the offense. *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 56; *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 34.

¶ 29    We find the evidence sufficient to establish Miller's accountability for aggravated home repair fraud. Miller was present for and engaged in the entirety of the offense. Williams's testimony established that Miller drove past her house and asked if she needed any work done. Thus, Miller was the first person to solicit business from Williams and was the cause of her subsequent interaction with J.R. Immediately after J.R. quoted Williams $300 or $400, Miller began "work" on her chimney. Shortly after that, J.R. spoke with Miller in a language Williams could not understand, then increased the price to $3,100, citing the per-pound cost of concrete. Despite this tenfold increase in price, Miller did not even install the device he knew Williams wanted and did not indicate he would return to complete the job.

¶ 30    Christopher Domina's testimony established the "work" Miller and his codefendants performed was worth $200, not the $3,100 J.R. charged. Miller's work on the chimney, specifically, was subpar and took a fraction of the time work done to meet the professional standard. Domina also established J.R.'s claimed basis for the price increase, the per-pound cost of concrete, was not a standard used in the masonry industry. A reasonable factfinder could

conclude Miller and his codefendants' interaction with Williams was a fraudulent scheme in which each man played a specific role: J.R. "negotiated" the price with Williams while Miller and Angelo created the illusion of repairing her chimney and the side of her house, respectively. Miller, therefore, served as an integral part of a common criminal design with his codefendants.

¶ 31 Moreover, Miller made no effort to withdraw from the fraudulent scheme. Courts presume a defendant's membership in a common criminal enterprise continues until withdrawal "(1) by wholly depriving the group of the effectiveness of [their] prior efforts in furtherance of the crime; (2) giving timely warning to the proper law enforcement authorities; or (3) otherwise making proper efforts to prevent the commission of the crime." *People v. Jones*, 376 Ill. App. 3d 372, 386 (2007); 720 ILCS 5/5-2(c)(3) (West 2016). Miller did none of these things. Rather, he followed Williams to the bank with his codefendants so she could pay them. Williams testified she fully intended to give the Millers a $3,100 cashier's check. A reasonable factfinder could infer that, had McNeela not happened by, Miller and his codefendants would have taken the check and fled. Altogether, the evidence supported a reasonable conclusion that Miller participated in a scheme to defraud the elderly Williams by charging her more than 15 times the job's actual worth.

¶ 32 Miller contends he did not know J.R. planned to charge Williams $3,100 and did not discuss the price of the work with her. But, the State did not have to prove Miller knew J.R. planned to charge Williams $3,100 specifically. Rather, the State had to prove Miller was accountable for J.R.'s use of deception to induce Williams to pay for home repair. See 815 ILCS 515/3(a)(2), 5(i) (West 2016). As explained, the evidence established Miller participated in this fraudulent scheme for its entire duration and would have left with his codefendants and Williams's $3,100 check had McNeela not intervened. To the extent Miller suggests he was following J.R.'s orders, the trial

court need not accept the most innocent possible explanation for Miller's actions. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 32. Accordingly, the evidence sufficiently supports the guilty finding under a theory of accountability.

¶ 33 We need not address Miller's contentions regarding the shared intent theory of accountability. Instead, we review all the evidence presented at trial and ask whether the factfinder could reasonably conclude the State proved Miller's guilt beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 117-18 (2007). Given the evidence presented at trial, we find the State did prove Miller guilty beyond a reasonable doubt under the common design theory of accountability.

¶ 34 Affirmed.