2024 IL App (1st) 221748

SIXTH DIVISION
May 10, 2024

No. 1-22-1748

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 6853 |
| COURTNEY EALY, | ) ) | The Honorable Vincent Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.

Justices Hyman and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, 19-year-old Courtney Ealy, and his codefendant, 17-year-old Clint Massey, were both convicted after a joint jury trial of first degree murder. The convictions stemmed from the shooting death of taxi driver Javan Boyd, in the early morning hours of February 22, 2014, in front of the Wentworth Gardens housing project. The State's evidence at trial established that the taxi driver was sitting in his car, waiting for a customer, when two men whom he did not know approached him, shot him, and fled. The shooting was recorded by nearby security cameras, and the two men were identified by eyewitnesses as defendant and

codefendant Massey. On this appeal, defendant concedes that he approached the victim's car at the time of the shooting.

¶ 2          The jury found both defendants guilty of first degree murder but found that codefendant Massey was armed with a firearm while defendant was not. After trial, defendant was sentenced to 38 years with the Illinois Department of Corrections (IDOC), while Massey received a sentence of 39 years. On direct appeal, defendant argued (1) that the evidence against him was insufficient, (2) that the State made improper comments at trial, (3) that he was denied his right to a speedy trial, and (4) that his 38-year sentence was excessive. Both defendant's conviction and Massey's conviction were affirmed by this court on direct appeal. *People v. Ealy*, 2019 IL App (1st) 161575; *People v. Massey*, 2023 IL App (1st) 220123.

¶ 3          After his 2019 appeal, defendant retained private counsel, and on September 14, 2020, defendant's counsel filed a postconviction petition on defendant's behalf. The petition was accompanied by affidavits and advanced to the second stage. On November 1, 2022, the trial court granted the State's motion to dismiss the petition, and this dismissal is the subject of the present appeal. The Office of the State Appellate Defender initially represented defendant in this appeal, but on April 26, 2023, this court granted defendant's motion for permission to proceed *pro se*. For the following reasons, we affirm.

¶ 4                                             BACKGROUND

¶ 5          We described the evidence at trial in detail in our prior opinions, and we incorporate those opinions here by reference. *Ealy*, 2019 IL App (1st) 161575; *Massey*, 2023 IL App (1st) 220123.

¶ 6                                          I. Evidence at Trial

¶ 7          In our prior opinion regarding defendant, we described the evidence at trial as follows:

"On the night of February 21, 2014, defendants attended a party at 39th Street and Wentworth Avenue in the Wentworth Gardens housing project. [Defendant] wore a Burberry shirt and white pants, and Massey wore a tiger-striped jogging suit. Also attending the party were Kaprice Johns, Jasmine Brown, Germontay Carpenter, T'Keyah Herbert, and Jerome Anderson.

Defendants left the party with Herbert in Herbet's van. After they left, Johns, who remained at the party, got into an argument with a group of women known as 'Pretty in Pink' because Johns disliked the song that was being played. As they argued, someone fired a gun into the air multiple times. Johns did not see who fired the shots, but she guessed that the shooter wanted to stop the argument because it was too loud. The gunshots did not hit anyone.

After the altercation, Johns left the party with Brown, Carpenter, and Anderson. They left in Johns's car, with Anderson driving. Carpenter made a phone call to either [defendant] or Massey, who were still with Herbert in her van, and told them about the altercation at the party. Carpenter put the call on speakerphone, and Brown could hear [defendant's] voice, which she recognized, on the other end.

Anderson drove to Wendy's, where they met up with a red car and Herbert's van. [Defendant] and Massey exited the van and got into the red car, along with a man named D-Rose. (A fourth man, unidentified at trial, was the driver.) The three vehicles drove back toward Wentworth Gardens in a convoy: first the red car, then Herbert's van, then Johns's car. According to Johns, they intended to 'see who shot at [them]' and 'deal with the matter.'

3

Meanwhile, [the taxi driver's customer] was visiting her mother in Wentworth Gardens. Around 3 a.m. on the morning of February 22, she called for a taxi to go to a friend's house. [A driver] was dispatched to the call.

As the three-vehicle convoy approached 38th Street and Princeton Avenue, they passed [the taxi driver] sitting in his parked car, waiting to pick up [his customer]. The three vehicles all made a U-turn and came to a stop. [Defendant], Massey, and D-Rose disembarked from the red car and approached [the taxi driver's] car from the passenger side.

Both Johns and Herbert witnessed the shooting. According to Johns, [defendant] and Massey were standing next to each other, with D-Rose behind them. [Defendant] and Massey spoke to [the driver], and then Johns saw 'a light flash from the gun' and [the driver] 'jumping' as if he was getting shot. At trial, Johns said she did not see the actual gun, but in a prior statement to detectives, Johns identified [defendant] as the shooter. After the shooting, D-Rose ran back to Johns's car and got inside, saying 'sh**' and 'he's dead.' [Defendant] and Massey ran back to one of the other vehicles, and all three vehicles drove away. As they left, Johns could see [the taxi driver] 'slumped over' in his car.

Herbert saw [defendant] and Massey open [the taxi driver's] passenger-side door and then saw Massey firing a gun into the car. She heard four or five gunshots, after which [defendant] and Massey returned to the red car and drove away.

The shooting was captured on surveillance cameras belonging to the Chicago Housing Authority (CHA), which owns the Wentworth Gardens housing project. The video footage was played for the jury. In the videos, three vehicles drove past [the] taxi

and then came driving back the other way. The convoy leader, a red car, stopped next to [the] taxi and two men got out, one wearing a striped track suit (Massey) and the other wearing a brown shirt and white pants ([defendant]). They approached [the parked] car from the front passenger side and appeared to be talking to him. [The] taxi started backing up, but hit a vehicle parked a couple of feet behind him. (At this point, D-Rose got out of the red car and ran back toward Johns's car.) There was a bright flash of light near [defendant's] hand; [the parked] car surged forward and hit another parked car in front. [Defendant] and Massey ran forward to look in the front passenger window. [Defendant] returned to the red car, Massey followed him a few moments later, and the three vehicles drove away.

\*\*\*

After leaving the scene of the shooting, Johns dropped Anderson off at his house and then drove to the Shell gas station at 55th Street. [Defendant] was waiting there. He entered Johns's car, told her that he dropped his iPhone at the scene, and asked her to help him retrieve it. Brown said that it was stupid to go back, but Johns agreed to do it. On the way there, [defendant] spoke about the shooting. He said that he asked the victim if he was 'from over here' and specified the part of Wentworth Gardens where the party had been. The victim said he was. [Defendant] also said, 'man down,' which Johns understood to mean the victim was dead.

By the time Johns returned to the scene of the crime, police had already cordoned off the area. Johns parked the car and approached on foot. She told officer Chris Martin that she had dropped her phone nearby and asked whether she could retrieve it. Martin refused, explaining that it was a crime scene.

5

Johns returned to her car and drove closer to the crime scene. While in the car, she spoke with Sergeant Arthur Young. She gave him a fake name ('Brianna Johns') and also a fake story, telling him that she was driving in the area when she heard several gunshots and saw a man with braided hair and a dark sweater near the victim's car; she got scared and dropped her phone near the victim's car. Johns then gave Young the phone number. Although Johns did not have [defendant's] number memorized, [defendant] told her the number as she was speaking to Young. ***

Officers did, in fact, find an iPhone in the middle of the street near the victim's vehicle. Pursuant to a search warrant, detectives conducted data extraction on the phone, which revealed its number was [the number given by Johns]. The phone was also swabbed for DNA; testing revealed a mixture of at least three DNA profiles that were not suitable for comparison.

A latent fingerprint impression recovered from [the taxi's] passenger side window was identified as belonging to [defendant]. Inside [the victim's] car, the police recovered three 9-millimeter fired cartridge casings and two 9-millimeter fired bullets; additionally, the medical examiner recovered two more 9-millimeter bullets from [the victim's] chest. Kellen Hunter, a firearms examiner for the Illinois State Police, determined that the bullets were all fired from a single gun, and the cartridge casings were all fired from a single gun. He was unable to determine whether the bullets and cartridges were fired from the same gun, since it is impossible to match a fired bullet to a fired cartridge casing. He also could not determine what kind of gun they were fired from, since both 9-millimeter revolvers and 9-millimeter semi-automatic weapons exist." *Ealy*, 2019 IL App (1st) 161575, ¶¶ 3-17."

¶ 8    With respect to both defendants, the State sought a conviction for first degree murder and a 15-year sentence enhancement for being armed with a firearm. The jury was instructed on accountability, as follows:

"A person is legally responsible for the conduct of another person, when, either before or during the commission of the offense and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense. The word 'conduct,' includes any criminal act done in furtherance of the plan and intended act."

After finding both defendant and Massey guilty of first degree murder, the jury returned an acquittal for defendant regarding the firearm enhancement that stated: "We, The Jury, find the allegation was *not* proven that during the commission of the offense of First Degree Murder that the defendant [ ] was armed with a firearm." (Emphasis added.) The jury found that the firearm allegation, however, "was proven" for codefendant Massey. The jury returned its murder verdicts on a general verdict form that stated simply: "We, The Jury, find the defendant [ ], Guilty of First Degree Murder." As already noted, the convictions of both defendant and Massey were affirmed on appeal.

¶ 9    II. Postconviction Process

¶ 10    On September 14, 2020, defendant's counsel submitted a postconviction petition that was accompanied by affidavits from Kaprice Johns, Germontay Carpenter, and defendant. At trial, Johns and T'Keyah Herbert were the two eyewitnesses who testified to witnessing the shooting. Herbert had testified that she saw defendant and Massey open the passenger-side door of the victim's car and saw codefendant Massey firing a gun into the car.

¶ 11    Like Herbert, Johns had also testified to witnessing defendant and Massey approach the victim's car. Johns testified that defendants spoke to the victim and that she then saw "a light flash from the gun" and saw the victim "jumping" as if he was being shot. Although at trial Johns testified that she did not see the actual gun, Johns had stated in a prior statement to detectives that defendant was the shooter.[1]

¶ 12    In the affidavit submitted with this petition, Johns averred that defendant and codefendant Massey "talked to a man sitting in a parked car" and that she "then heard several shots fired and saw light flashing because it was dark." However, she averred: "I did not see a gun or who shot the man." Johns averred that a week or two after the shooting, she was taken into custody and "threatened" by police "with an attempted murder charge." Since she "felt threatened" and "afraid," she told the police that defendant was the shooter. However, she averred that she did not know if defendant shot the victim, that she did not see defendant shoot the victim, and that she did not see a gun before or after the shooting.

¶ 13    Carpenter did not testify at trial. In the affidavit that he submitted with defendant's petition, Carpenter averred that he was sitting in Johns's car, that he observed a man sitting in another car, and that "[m]ost people sitting in their vehicle" in that neighborhood "at that time of night" were selling "weed." Carpenter averred that defendant "wanted to get some weed" and that Carpenter assumed that defendant was trying to buy weed from the man in the other car. Carpenter then heard several shots fired but did not see a gun or who shot the man. Carpenter averred that he had never known defendant to have or use a gun. Defendant also submitted his own affidavit in which he averred that, moments after asking the man whether

---

[1]However, the jury specifically found that the State had failed to prove that defendant was armed with a firearm.

he had marijuana, defendant "remember[ed] seeing flashes." Portions of defendant's affidavit were illegible, a fact which the State later noted in its response, and so defendant supplemented it with a second affidavit which is described below.

¶ 14    In addition to the Johns and Carpenter affidavits, the petition alleged (1) that the trial court erred in denying defendant's motion for a severance and (2) that defendant's 38-year sentence, imposed for an offense committed when he was 19-years old, was excessive and disproportionate.

¶ 15    On October 6, 2020, defendant's postconviction counsel submitted a supplemental petition for postconviction relief with additional affidavits, including a second affidavit from defendant. In this second affidavit, defendant averred that "it was known that marijuana is sold in the projects" and that, after noticing a parked vehicle, defendant "decided to see if marijuana can be purchased from this individual" in the parked vehicle. Defendant averred: "The next thing [*sic*] shots were fired, and I went into a shock." Defendant "remembered my friend running past saying something like this was not the plan." Defendant stated unequivocally: "I did not have a firearm or shoot anyone the day of Feb. 21, 2014."

¶ 16    Ahbir Sardin[2] averred that he was in the same car as defendant immediately prior to the shooting and that: "I knew that [defendant] was not armed because his clothes were so tight that I would have noticed." Sardin averred that, after they arrived at the housing project, defendant "stated that he wanted to purchase some marijuana and that he would see if the man in the car who was sitting had some." However, "[a]fter 30 seconds or so [defendant] ran back

---

[2]In the court's description of evidence reprinted above at paragraph 7, Sardin is the person referred to as "D-Rose." *Supra* ¶ 7.

to the car with a shocked and surprised look on his face! [Defendant] was empty handed when he got back to the car, and I did not see him shoot anyone February 21, 2014."

¶ 17     On December 7, 2020, the State moved to dismiss defendant's petition. The State argued, first, that defendant's trial counsel was not ineffective with respect to the severance issue, where trial counsel had moved to sever defendant's case from that of his codefendant and had raised this issue again in a posttrial motion. The State argued that the trial court's decision to deny counsel's motion could not be attributed to counsel and, thus, counsel was not ineffective with respect to this issue.The State argued, further that although defendant claimed that codefendant's counsel continually argued that defendant was the shooter, "no such statement was made in the pages [defendant] cites, or anywhere else during closing argument." Next, the State argued that defendant failed to explain how the affidavits he submitted were material to an ineffectiveness claim and that defendant had failed to provide facts to indicate why his sentence was excessive or disproportionate, particularly where he was not a juvenile.

¶ 18     Lastly, the State argued that the submitted affidavits failed to support an actual innocence claim because the affidavits did not constitute evidence, which was new, material, or conclusive. The State argued that Johns's affidavit was essentially a restatement of the testimony that she had already given at trial and that Carpenter and Sardin were witnesses who were known at the time of trial.

¶ 19     On December 28, 2021, defendant's postconviction counsel filed a response to the State's motion. However, on January 5, 2022, the same counsel filed a motion to withdraw, stating that "[c]ommunciation has irretrievably broken down between the parties" and that defendant requested that counsel seek to withdraw. On January 18, 2022, defendant submitted a handwritten *pro se* response, and the response stated that it was submitted by counsel. On

February 14, 2022, defendant filed a "motion for counsel to withdraw and proceed *pro se*." Ten days later, on February 24, 2022, the trial court permitted defendant's counsel to withdraw and directed an assistant public defender to appear on the next court date. Also on February 24, 2022, defendant filed a "supplemental petition for post-conviction relief," which alleged (1) coercion of the statement by Johns that identified defendant as the shooter; (2) prosecutorial misconduct relating to the coerced statement, including a failure to disclose both the coercion and a pattern of misconduct by the detective involved; (3) ineffective assistance by trial and appellate counsel relating to the identification; and (4) actual innocence. On March 28, 2022, a new counsel entered an appearance on behalf of defendant. On May 16, 2022, the new counsel moved to amend the supplemental petition filed in February 2022, with a list of cases to support defendant's claim of pervasive misconduct by Detective John Halloran.

¶ 20    On November 1, 2022, a second-stage hearing was held before the same judge who had presided over defendant's jury trial. Defendant and his new counsel were both present. At the hearing, defendant's new counsel indicated that he adopted defendant's *pro se* response to the State's motion, as well as the response filed by prior counsel. Counsel began by arguing (1) that appellate counsel was ineffective for failing to raise the severance issue and (2) that the law regarding young adult sentencing was in flux and evolving. However, the point that counsel stated that he "really want[ed] to stress" was "the presence of Detective John Halloran who is a member of the infamous crew headed by Detective Burge" and who, defendant claims, coerced Johns's pretrial statement in which she identified defendant as the shooter. Counsel argued that a third-stage evidentiary hearing was required due to Halloran's involvement, plus defendant's evidence of actual innocence in the form of Johns's, Carpenter's and Sardin's affidavits.

¶ 21    When the trial court asked counsel about the connection between Carpenter and Halloran, counsel conceded that defendant did not contend that Halloran coerced Carpenter. In response, the State argued that there had been no allegation by Johns or any of the witnesses that Halloran coerced them and that Johns's affidavit was perfectly consistent with her trial testimony.

¶ 22    The trial court found (1) that no ineffectiveness existed regarding the severance issue, since appellate counsel does not have to raise every possible claim and trial counsel did raise the issue, and (2) that the law regarding juvenile sentencing did not apply to defendant. The court did not advance the actual innocence claim, noting that Johns's allegations were considered during her testimony at trial, that Carpenter did not allege coercion, and that defendant had had an opportunity to testify at trial if he had so chosen.

¶ 23    On November 9, 2022, defendant filed a *pro se* notice of appeal. On November 18, 2022, the trial court appointed the Office of the State Appellate Defender to represent defendant on appeal. The record on appeal was filed on February 7, 2023, and this court subsequently granted a couple of motions by the assistant appellate defender for extensions of time to file a brief.

¶ 24    On April 26, 2023, this court granted defendant's motion to proceed *pro se* on appeal and also granted defendant's motion to file *instanter* his *pro se* appellate brief. The brief raised four issues for review: (1) that appellate counsel was ineffective for failing to raise a claim that defendant's trial should have been severed from his codefendant's trial; (2) that the State relied on coerced statements at trial; (3) that the State failed to disclose, and his trial counsel was ineffective for failing to discover, a pattern and practice of misconduct by Halloran; and (4) that

defendant had made a substantial showing of both actual innocence and ineffective assistance of counsel.

¶ 25 On May 26, 2023, this court entered an order permitting defendant to file a supplemental brief. In this second appellate brief, defendant raised three issues, namely: (1) severance, (2) coercion of a witness's statement, and (3) actual innocence.

¶ 26 On June 27, 2023, this court permitted defendant to file a third brief, which supplemented the first and second briefs that he had already filed. This third brief stated that it concerned: "Denial of Severance."

¶ 27 On September 18, 2023, the State filed its response. On October 5, 2023, defendant filed a reply brief. On October 25, 2023, defendant filed a motion seeking to file a supplemental reply brief, and on March 11, 2024, he filed a motion to issue a decision; both motions were taken with the case.

¶ 28 ANALYSIS

¶ 29 I. Stages of the Post-Conviction Hearing Act

¶ 30 Defendant seeks relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/art. 122 (West 2020)). The Act provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. It is not a substitute for appeal but, rather, a collateral proceeding that attacks a final judgment.

¶ 31 The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2020); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 32    At the second stage, counsel is appointed if a defendant is indigent and unrepresented by counsel. 725 ILCS 5/122-4 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 33    In the case at bar, defendant's petition was dismissed at the second stage. The issue at this stage is whether the petition made a substantial showing such that an evidentiary hearing is warranted. *People v. Sanders*, 2016 IL 118123, ¶ 37. The court must accept as true both the petition's allegations and its supporting evidence "unless they are positively rebutted by the record of the original trial proceedings." *Sanders*, 2016 IL 118123, ¶ 48. At the second stage, the allegations in the petition are "liberally construed in favor of the petitioner." *Sanders*, 2016 IL 118123, ¶ 31. "All well-pleaded factual allegations must be taken as true ***." *Sanders*, 2016 IL 118123, ¶ 37. "[T]here are no factual issues" at the second stage. *Sanders*, 2016 IL 118123, ¶ 31. "Credibility determinations may be made only at a third-stage evidentiary hearing." *Sanders*, 2016 IL 118123, ¶ 42.

¶ 34    If a defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. A third-stage evidentiary hearing is what defendant here seeks. At a third-stage evidentiary hearing, the trial court would act as fact finder, determining witness credibility and the weight to be given particular testimony and evidence and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 35        When no evidentiary hearing is held, as in the case at bar, a reviewing court's standard of review is *de novo*. *Sanders*, 2016 IL 118123, ¶ 31 (a second stage dismissal is reviewed *de novo*). *De novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 36                                    II. Severance Issue

¶ 37        Defendant claims that his appellate counsel was ineffective for failing to raise the severance issue. Defendant also claimed that his trial counsel was ineffective regarding this issue; however, as the trial court noted, trial counsel did raise it, both in a motion to sever and in a posttrial motion for a new trial. As the trial court observed, trial counsel cannot be blamed for the court's decision not to sever. For the following reasons, we find that appellate counsel was also not ineffective on this ground and that the trial court's denial of defendant's severance motion is not grounds for a new trial.

¶ 38                A. Ineffective Assistance Claim Regarding Appellate Counsel

¶ 39        To establish that appellate counsel was ineffective, a defendant must satisfy the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). *People v. English*, 2013 IL 112890, ¶ 33. Under the *Strickland* standard, a defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *English*, 2013 IL 112890, ¶ 33. An appellate counsel is not required to raise every possible issue on appeal. *English*, 2013 IL 112890, ¶ 33. Instead, we expect appellate counsel to exercise his or her professional judgment and expertise to select, from among the various arguable claims of error, the ones that may succeed. *English*, 2013 IL 112890, ¶¶ 33-34; *People v. Haynes*, 192 Ill. 2d 437, 476

(2000) ("Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence *** unless counsel's appraisal of the merits is patently wrong.").

¶ 40    In the case at bar, we cannot find either deficient performance or a reasonable probability of success where, as we explain below, we cannot find a reasonable probability that this claim would have succeeded on appeal. *Haynes*, 192 Ill. 2d at 476 ("unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal").

¶ 41                                    B. Severance

¶ 42    In the case at bar, prior to trial, trial counsel stated orally to the trial court that she intended to make a written motion for severance but that she had not yet filed it. The following exchange then occurred:

> "THE COURT: What's the basis of your motion for severance.
>
> [TRIAL COUNSEL]: We're just moving to make a motion for severance. That's our sole basis.
>
> [ASSISTANT STATE'S ATTORNEY (ASA)]: Your Honor, neither of the defendants in this case gave statements. All the other witnesses and evidence go to both defendants.
>
> THE COURT: So, there's not antagonistic defenses?
>
> [ASA]: Correct.
>
> THE COURT: Your motion for severance will be denied."

When trial counsel for codefendant Massey arrived in court, the court informed him that a motion for severance had been made on behalf of defendant. About a half page later in the transcript, the court asked Massy's counsel whether there were "any conflicts." The State

quotes this exchange in its appellate brief, as though this exchange refers to defendant's severance motion. However, the court follows up counsel's answer that there were no "conflicts" by asking: "Anybody going on vacation or anything else like this in July or August [?]" Thus, the question about "conflicts" appears to be a reference to the attorney's calendar rather than to defendant's severance motion. However, whether Massey counsel's answer refers to his calendar or to severance is not relevant to our analysis since we do not rely on a codefendant counsel's assessment of whether a severance was warranted in determining whether one was or was not required.

¶ 43   "The long-established rule in this jurisdiction is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Gabriel*, 398 Ill. App. 3d 332, 346 (2010); *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 202 (defendants are generally tried together "when charged with an offense arising out of a common occurrence"); 725 ILCS 5/114-8(a) (West 2020) (if a defendant "is prejudiced" by joinder, a court "may order separate trials"). "The trial court has broad discretion in deciding whether or not to sever codefendants for trial, and as a reviewing court, we will affirm, unless that decision constitutes an abuse of discretion." *Henderson*, 2017 IL App (1st) 142259, ¶ 201. "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court." *Henderson*, 2017 IL App (1st) 142259, ¶ 201

¶ 44   Our supreme court has recognized two types of prejudice where severance is generally required. *Gabriel*, 398 Ill. App. 3d at 346. First, severance is generally required when the statement of a codefendant implicates the defendant. *Gabriel*, 398 Ill. App. 3d at 346 (citing *People v. Bean*, 109 Ill. 2d 80, 93 (1985)). This is because admission of the codefendant's

17

statement would impair the defendant's constitutional right to confront and cross-examine the witnesses against him. *Gabriel*, 398 Ill. App. 3d at 346. In the case at bar, neither defendant nor Massey gave a statement, so this concern is not present on these facts.

¶ 45     Second, severance is required when the defenses of codefendants are so antagonistic that a severance is necessary to ensure a fair trial. *Gabriel*, 398 Ill. App. 3d at 346-47 (citing *People v. Daugherty*, 102 Ill. 2d 533, 542 (1984)). "Actual hostility between the two defenses is required." *Bean*, 109 Ill. 2d at 93. Thus, for example, our supreme court in *Bean* found severance was required where a codefendant presented an alibi defense claiming that the defendant was the murderer (*Bean*, 109 Ill. 2d at 86), such that the codefendant "could only convince the jury of his own innocence by convincing them to convict" the defendant. *Bean*, 109 Ill. 2d at 95.

¶ 46     In the case at bar, the opening statements of all the parties show one unified defense strategy to argue that defendants were not there and that State witnesses were lying, and one unified prosecution strategy to argue that defendants were, in fact, there. In its opening statement, the State argued that the evidence would show that defendant and Massey "approached" the taxi driver's car, "fired the fatal shot," and "left the scene." The State did not make separate arguments regarding the defendants. Massey's counsel argued that Massey was simply "not there," in that there was no physical evidence linking Massey to the offense and that Massey was not on the videotape. In defendant's opening statement, counsel asked the jurors to ask themselves why the State's witnesses were not charged. Counsel argued: "That's something that you're going to have to keep asking yourself about when you hear the evidence, when you hear the Prosecution try to tell you that [defendant] was there and that he committed

this crime." The opening statements do not show antagonistic defenses, but rather a general defense strategy to discredit the State's case about defendants' alleged presence at the scene.

¶ 47      Defendant's postconviction petition, filed September 14, 2020, alleged: "The cross-examination by co-defendant counsel of witness[es] Johns and Brown continually pointed out that [defendant] was the only one talking about 'taking care of business.' " However, this phrase came up during Massey's cross-examination of Johns, not Brown, and the cross-examination of Johns does not suggest antagonistic defenses.

¶ 48      During codefendant Massey's cross-examination of Johns, who was one of the State's key eyewitnesses, Massey's counsel emphasized that his client had nothing to do with the original fight, that Johns was mad, and that she was heading back toward the projects because she (Johns) was "going to take care of business." With respect to defendant, Johns repeated during Massey's cross-examination the portion of her direct where she stated that she drove defendant back to the crime scene to look for his phone and that she lied to police regarding the phone. During cross, she asserted that the officers never told her that she had the right to remain silent, that they told her that she "could be charged with it if [she] didn't tell them" what happened, and that she was in custody for 72 hours. At the very end of Massy's cross-examination, Johns repeated that she spoke to defendant about the shooting after it happened but not Massey and that she did not see Massey with a gun. Very little of this was antagonistic to defendant's defense and what was antagonistic was largely a short repeat of her direct testimony.

¶ 49      Like Massey's counsel, defendant's counsel emphasized during her cross-examination of Johns that Johns lied to police when she spoke to them on the scene about the cell phone, that she was held for 72 hours, and that she knew she could be charged with being an accessory

to murder. Johns further admitted that she knew she could face a minimum of 35 years in prison. During Massey's short two-question recross, Massey's counsel emphasized that Johns lied to the police at the crime scene and lied to them again at the police station. The major points made during the two cross-examinations and the short recross were remarkably similar and, thus, not proof of a need for severance.

¶ 50        Defendant's petition, filed September 14, 2020, alleged that the closing argument of Massey's counsel "continually emphasized that it was [defendant] who was the shooter."

¶ 51        During the State's closing, the State argued that "they" were shooting and that it did not matter if one was the shooter or the other, or if the gun was going back and forth, because "[t]hey were committing the shooting together." During defendant's closing, his counsel argued, among other things, that: "Not one single witness took that stand and said [defendant] shot." However, he argued further: "I am not insinuating that Clint Massey shot a gun. I am insinuating that those women on the stand had reason to lie." Massey's counsel argued that "[n]ot one of you can look at that video" and identify Massey from it, that no physical evidence linked Massy to the shooting, and that he was simply not there. Massey's counsel did not argue that defendant was the shooter.

¶ 52        After a careful review of the pretrial ruling, the opening statements, the evidence at trial, and the closing arguments, we cannot find that the trial court abused its discretion prior to trial by denying defendant's motion for severance or that defendant suffered undue prejudice as a result.

¶ 53                        III. Alleged Coercion of Johns

¶ 54        In his supplemental petition filed on February 24, 2022, defendant argued that convictions based on witness statements procured through police intimidation or coercion

20

violate due process (*People v. Jackson*, 2021 IL 124818, ¶ 29) and that, additionally, a pervasive pattern of criminal conduct by police officers is sufficient to reconsider the voluntariness of a statement (*People v. Tyler*, 2015 IL App (1st) 123470, ¶ 189).

¶ 55        Defendant alleges that Johns's identification of defendant as the shooter was coerced by Halloran, that his trial and appellate counsel were ineffective for failing to discover a pattern and practice of misconduct by Halloran, and that the prosecution engaged in misconduct by failing to disclose it.

¶ 56        However, the Johns affidavit that defendant submitted with his petition does not name Halloran. The affidavit does allege, as Johns testified to at trial, that Johns felt coerced because police told her that she could be charged in connection with the murder. Defendant does not present allegations of coercion by any other witness. As for Johns's affidavit, it is essentially a restatement of her trial testimony, which was subjected to thorough cross-examination and argued by all sides in closing.

¶ 57        In this appeal, defendant concedes his presence at the scene of the shooting. That fact is averred in his own affidavit, as well in the affidavits of the other witnesses that he submits, namely, Johns, Carpenter, and Sardin. The coercion allegation is thus directed at Johns's pretrial identification of defendant as the shooter, which she recanted both at trial and in her newly submitted affidavit. However, the jury specifically found, by special verdict, that defendant was not "armed with a firearm." We fail to see how defendant's due process rights were violated at trial, where Johns's allegation of coercion was disclosed, cross-examined, and argued at trial; where, although Halloran has been the subject of cases alleging a pattern of misconduct, Johns's affidavit does not allege any acts by him; and where the jury did not find

that defendant was "armed with a firearm" despite Johns's allegedly coerced statement to the contrary. For these reasons, we do not find defendant's due process claim persuasive.

¶ 58                                    IV. Actual Innocence

¶ 59         Defendant alleges that he is actually innocent. The evidence supporting an actual-innocence claim must be (1) new, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Allen*, 2015 IL 113135, ¶ 22; *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. "Material means the evidence is relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. To be material, the evidence "need not, standing alone, exonerate the defendant; rather, it must tend to 'significantly advance' his claim of actual innocence." *People v. Stoecker*, 2014 IL 115756, ¶ 33. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. Conclusive means that the additional evidence, "when considered along with the trial evidence, would probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key ***." *Coleman*, 2013 IL 113307, ¶ 97. A piece of new evidence is conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence also presented by the petitioner. *Sanders*, 2016 IL 118123, ¶ 53; see *Coleman*, 2013 IL 113307, ¶¶ 104-08 (considering together the statements of all the new witnesses presented by defendant).[3]

---

[3]Our supreme court has "specifically rejected the total vindication or exoneration standard" set forth in *People v. Savory*, 309 Ill. App. 3d 408, 415-16 (1999). *People v. Robinson,* 2020 IL 123849, ¶ 55 (citing *People v. Savory*, 197 Ill. 2d 203, 213 (2001) (specifically rejecting the "complete vindication" standard set forth in the lower court's opinion)).

¶ 60　　To support an actual innocence claim, the evidence must satisfy all three requirements: (1) newly discovered, (2) material, and (3) of such a conclusive character as to probably change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Once a reviewing court determines that a witness's testimony is "not new because it could have been discovered earlier through the exercise of due diligence," the reviewing court's analysis of that evidence may stop there. *Coleman*, 2013 IL 113307, ¶ 100 (the supreme court's analysis of the testimony of Nickerson and Roberson ended with its conclusion that their testimony was not newly discovered). In the case at bar, the witnesses, from whom defendant submits affidavits, were all known at the time of trial, and no explanation is offered as to why their statements could not have been discovered and obtained earlier through the exercise of due diligence.

¶ 61　　We could affirm the dismissal of defendant's actual innocence claim on that ground alone. However, we also find, for the reasons explained below, that the statements are not of such a conclusive nature as to probably change the result at a retrial.

¶ 62　　In these statements, defendant is putting forward an alternate theory to the one he presented at trial. In this version, defendant and the witnesses who he now puts forth readily admit that he was at the scene of the shooting, that he approached the victim's car in the seconds prior to the shooting, and that he ran from the victim's car after the shooting. However, in this version, he claims that he approached to inquire about purchasing marijuana and that he was shocked when shots were fired.

¶ 63　　As we already noted, defendant does not offer a reason why he could not have presented this version at his original trial. Defendant had the opportunity to testify in his own defense and present this version at trial, and all these witnesses were known.

¶ 64    In addition, the marijuana-buying theory is not so conclusive and persuasive as to probably change the result at trial, where it places him at the scene of the shooting, where it has him approaching the victim's car in the seconds prior to the shooting, where his fingerprint was found on the passenger side of the victim's vehicle, where he and apparently the shooter were both by the victim's car at the exact same time, which was also the exact same moment that the shooting occurred, and where he ran after shots were fired and the victim was killed.

¶ 65    None of the affidavits name the shooter—not even defendant's affidavit. Only defendant's affidavit swears he was not the shooter. The other affidavits do not state who the shooter was. Instead, they say that defendant was in the vicinity of the shooting and that they did not see who shot—thereby leaving open the possibility that defendant did the shooting.

¶ 66    However, even if Sardin's affidavit, which avers that defendant was not armed, exonerates defendant from being the shooter, the jury already acquitted defendant of the being-armed allegation. Instead of tending to exonerate, these affidavits establish that defendant had at least the opportunity, either before or during the commission of the offense, to promote or facilitate the commission of the offense, by soliciting, aiding, abetting, agreeing to aid, or attempting to aid the shooter—as the accountability instruction requires. While averring that defendant was just innocently out there, coincidentally approaching at the exact wrong moment, to buy marijuana, they do not offer an alternate explanation of why this heinous act occurred or who did it. However, they do establish defendant's timely approach, his immediate proximity, and his instant flight. As a result, these affidavits are not so conclusive as to probably produce a different result at retrial.

¶ 67    Is it possible that defendant jumped out at the exact wrong moment to buy marijuana? These are teenagers; anything is possible.[4] However, "is it possible" is not the standard on this appeal. The question is whether the evidence is so conclusive as to create a reasonable probability of a different result, and these affidavits do not meet this standard, even if they qualified as newly discovered. For these reasons, we cannot find that defendant's actual-innocence claim warranted a third-stage evidentiary hearing.

¶ 68    In the interest of completeness, we note that defendant also put forth what he called "skip trace" evidence that the taxi driver did not live in the Wentworth Gardens housing project. However, the State never argued that he lived there. By contrast, in its opening, the State argued that he happened to be there because "[h]e had to go where the job took him." To the extent that the driver's residence is a relevant fact, it is one that defendant already raised, and we already considered on direct appeal. We stated:

> "[Defendant] argues that even if he shared a common criminal design to retaliate for the incident at the Wentworth Gardens party, he could not have planned to kill [the taxi driver], who was not connected to that incident. Indeed, at oral argument, counsel emphasized how apparently irrational it was that [defendant] and Massey would exact revenge for the earlier altercation between two groups of women by shooting a man who, as far as they were aware, had not even attended the party. But [the taxi driver] was only shot after he agreed (in response to [defendant's] query) that he was from 'over here,' while parked outside a Wentworth Gardens residence. The jury could have

---

[4]However, defendant's new marijuana-buying theory is contradicted by Johns's trial testimony, where she testified that defendant told her what he asked the taxi driver. What defendant said he asked the driver was *not* "did the driver have marijuana?" but rather "was he [the driver] from over here." While Johns's affidavit does not repeat this portion of her trial testimony, her affidavit does not retract it either. Unlike Sardin's and Carpenter's affidavits, Johns's affidavit says nothing about an intent to buy marijuana.

concluded that based on [the taxi driver's] response, [defendant] and Massey believed [the taxi driver] was one of the guests at the party and decided to 'deal with the matter' by shooting him." *Ealy*, 2019 IL App (1st) 161575, ¶ 33.

Hence, evidence of the taxi driver's residence is not newly discovered, in that no reason is put forth why it could not have been discovered earlier through due diligence, and it is not a fact that would probably affect the outcome of a retrial, for the reasons that we already explained on defendant's direct appeal.

¶ 69                                                          V. Sentence

¶ 70            Lastly, defendant argues that his sentence was excessive and disproportionate. However, in his petitions, defendant failed to allege specific facts to indicate why, although not a juvenile, his sentence was nonetheless excessive or disproportionate. This court observed that defendant argued on direct appeal "that his 38-year sentence for first degree murder was excessive in light of his youth (he was 19 at the time of the shooting) and 'the fact that he did not shoot the victim.' " *Ealy*, 2019 IL App (1st) 161575, ¶ 53. Rejecting this claim, we stated that we had reviewed the record and found no abuse of discretion by the sentencing judge and that the sentence was squarely within the middle of the possible 20-to-60-year sentencing range. *Ealy*, 2019 IL App (1st) 161575, ¶ 55. Further, under the line of sentencing cases that do apply to juveniles, defendant's 38-year sentence would not qualify as a life sentence even if he had been a juvenile at the time of the offense. *E.g.*, *People v. Buffer*, 2019 IL 122327, ¶ 41 ("a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment"). Where this claim was previously raised and considered, and where it lacks supporting factual detail, we cannot find it persuasive.

¶ 71                                    CONCLUSION

¶ 72        For the foregoing reasons, we do not find defendant's claims persuasive and affirm the

dismissal of his attorney-assisted and *pro se* postconviction petitions at the second stage. In

addition, we have taken two motions with the case: a motion to issue decision, which is now

rendered moot by the issuance of our decision, and a motion to file a supplemental reply brief.

In this appeal, the *pro se* defendant was already permitted to file a total of four briefs, which

is already double the number normally permitted appellants. Thus, this motion is denied.

¶ 73        Affirmed.

***People v. Ealy*, 2024 IL App (1st) 221748**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-6853; the Hon. Vincent Gaughan, Judge, presiding. |
| **Attorneys for Appellant:** | Courtney Ealy, of Sumner, appellant *pro se*. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Su Wang, and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |