2024 IL App (1st) 221426-U

No. 1-22-1426

Order filed July 19, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 18394 01 |
| | ) | |
| DANIEL GARCIA, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's summary dismissal of defendant's postconviction petition affirmed where defendant's claim of ineffective assistance of trial counsel was forfeited and the petition did not allege that counsel on direct appeal was ineffective for not raising the issue.

¶ 2    Defendant Daniel Garcia appeals from the summary dismissal of his *pro se* petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, Garcia argues that the circuit court erred in dismissing his postconviction petition because

he presented an arguable claim of ineffective assistance of trial counsel for counsel's failure to investigate and obtain documentation regarding his mental health history and request a fitness hearing. We affirm.

¶ 3     Garcia was charged with multiple offenses in connection with an incident that occurred on October 3, 2014. The State proceeded on three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4) (West 2014)) and one count of aggravated kidnapping (720 ILCS 5/10-2(a)(3) (West 2014)).

¶ 4     Following a jury trial, Garcia was found guilty on all four counts. The court sentenced him to consecutive prison terms of 25 years on each count, totaling 100 years. On direct appeal, this court affirmed the findings of guilt, vacated Garcia's sentences on the basis that the trial court penalized him at sentencing for exercising his right to trial, and remanded for resentencing. *People v. Garcia*, 2023 IL App (1st) 172005. At resentencing, the circuit court imposed consecutive prison terms of 18 years for each count, totaling 72 years. Garcia's appeal from resentencing is currently pending (No. 1-24-0358).

¶ 5     Prior to trial, Garcia was represented by an assistant public defender (APD), who requested a behavioral clinical exam (BCX) to evaluate Garcia's sanity at the time of the offenses. The APD noted that Garcia informed him that he had "some mental health issues *** in the past."

¶ 6     Dr. Nicholas Jasinski examined Garcia in October 2015 and found him to be legally sane at the time of the October 2014 offenses. Dr. Jasinski noted that Garcia's report of "psychotic symptoms" was "highly inconsistent with his calm, logical, and friendly presentation during the evaluation." Garcia reported having a learning disability, a past diagnosis of "bipolar," and three inpatient admissions. Garcia provided "vague" responses when Dr. Jasinksi asked about his

outpatient treatment history, and was evasive when asked follow-up questions. According to Dr. Jasinski, psychotropic medication was unnecessary, and Garcia had no mental illness diagnosis through June 2015. Dr. Jasinski further noted that he reviewed the police reports, which suggested that Garcia "took steps to obscure his identity during the alleged offense suggesting that he understood the criminal nature of his actions."

¶ 7     Dr. Jasinski also reviewed Garcia's records from Cermak Health Services and noted that Garcia had a "mental health intake screening" three days after his arrest, where he denied symptoms of psychosis or mania, and none were observed. Dr. Jasinski provided an excerpt from the records, which stated that Garcia was unable to provide "substantial information about consistent/recent treatment," and there was no "subjective or objective evidence of an affective or psychotic disorder" and a "strong concern the pt is exaggerating [symptoms] and seeking medical attention because he thinks it will help with his case and being granted MH probation."

¶ 8     The issue of Garcia's mental health arose again during bond hearings in November and December 2015, during which the APD stated that Garcia had not worked for the last four to five years because of a "bipolar disorder" and had received social security disability income. The circuit court inquired whether the APD sought a second opinion as to sanity, and the APD responded that he did not.

¶ 9     Four days prior to when the trial was to begin, attorney Frank Avila appeared and requested leave to file an appearance on behalf of Garcia. The court initially denied Avila's request, noting that Garcia's case had been pending for approximately two years and the court did not want to cause unnecessary delay. On the day the trial was to begin, the court allowed Avila to file his appearance and continued the trial. At a separate hearing, Avila informed the court that he spoke

with Garcia regarding stipulations, and Garcia informed him that "the stipulations [were] okay with him and not factors in [his] defense." When questioned by the court, Garcia confirmed that he reviewed stipulations with counsel and "didn't have any problems."

¶ 10    The State moved *in limine* to prohibit counsel from "bringing up anything regarding [d]efendant's mental health history." Counsel responded that he was not anticipating mentioning Garcia's mental health history, but Garcia was "bipolar" and received social security disability for "mental illness." Counsel further stated that "[m]ental illness [does] not necessarily indicate you're unfit for trial; it is also not the same as sanity."

¶ 11    At trial, C.P. testified that on October 2, 2014, she attended a party. Between 11:30 p.m. and midnight, she and a man left the party by car and went to a gas station. As C.P. sat in the passenger seat of her vehicle at the gas station, Garcia entered her vehicle and sat in the driver's seat. C.P did not know Garcia and screamed. Garcia repeatedly punched her in the face, while cursing and telling her to "shut up." Garcia drove the vehicle from the gas station. Garcia told C.P. that he was with "the cartel" and was there to kill her, and that "they" had kidnapped the man she was with and threw him into the trunk of a vehicle. Garcia also told her that he had a firearm.

¶ 12    After Garcia parked the vehicle, he grabbed C.P.'s breasts. When she resisted, he choked her with both hands until she almost lost consciousness. Garcia then "ripped the crotch" out of her shorts and vaginally penetrated her with his penis, while stating that she liked what he was doing. Garcia kissed her, licked her face, and touched her "all over" until he ejaculated. Garcia then returned to the driver's seat, grabbed C.P.'s hair, and forced her to "suck his penis" while making vulgar, sexual remarks. Garcia then grabbed her hair and made her get on top of him, while threatening to kill her. Garcia again vaginally penetrated her and inserted his finger in her anus.

C.P. did not consent to any of these acts. Garcia repeatedly threatened to kill her and told her he had a firearm. He climbed on top of C.P. again, vaginally penetrated her, and ejaculated inside of her, on the outside of her vagina, and on her inner legs. Garcia began looking for money inside the vehicle. C.P. informed him that she did not have any, and led him to a Chase bank. As Garcia drove, he played with C.P.'s hair and rubbed her shoulders, telling her that everything would be okay. He told C.P. about his life, daughter, and deceased mother. At the bank, Garcia asked for her debit card and withdrew $200. Garcia drove C.P. home and told her he would return the next day. Garcia programmed his number into C.P.'s cell phone and returned it to her. C.P. ran into her house and told her sister Polly.

¶ 13    Polly testified that C.P. told her that she had been raped.

¶ 14    The nurse who treated C.P. at the hospital testified that she noticed a "bruising hematoma on [C.P.'s] forehead." The doctor that treated C.P. at the hospital identified marks on C.P.'s face and neck, indicating possible punches and strangulation, in photographs.

¶ 15    Police stopped Garcia at approximately 4:15 a.m. on October 3, 2014, driving C.P.'s vehicle approximately a half mile from C.P.'s residence. Detective Mona Majeed testified that C.P. identified Garcia in a line-up. Garcia provided a DNA sample and buccal swab. Garcia's DNA matched C.P.'s vaginal and anal swabs, and he could not be excluded from the oral swabs.

¶ 16    Garcia testified that C.P. invited him into her vehicle, and the intercourse was consensual. He drove C.P.'s vehicle to her residence because C.P. was intoxicated. They first stopped at a Chase cash station, where C.P. withdrew $200. When he dropped C.P. off, she programmed his number into her phone. On cross-examination, Garcia admitted to placing his penis in C.P.'s mouth. Garcia then stated that C.P. forced herself on him and put his penis into her mouth.

¶ 17    The jury found Garcia guilty on all counts.

¶ 18    Garcia filed a motion for a new trial wherein defense counsel stated that he had recently discovered evidence that Garcia had an IQ of 70, suffered from bipolar disorder, and had memory issues, which would have provided him a "viable insanity defense" and explained to the jury his memory lapses. Specifically, this evidence was found by Garcia's family while going through storage boxes. Garcia alleged that counsel could not have discovered the evidence sooner because "the only individuals who could have known about [d]efendant's mental condition were not available." Garcia argued that the evidence was newly discovered, material, noncumulative, and would likely have resulted in a different outcome at trial "because it would have explained to the jury *** why [d]efendant had memory lapses during his testimony" and provided him with a "viable insanity defense." Attached to the motion was a release of patient health information from Advocate Health Care from 2007 signed by Garcia, a disability hearing officer decision from 2006, an Individual Treatment Summary by Allyson Blasius, LSW from January 2004, and a Chicago Public School (CPS) psychological evaluation from April 23, 2003.

¶ 19    In response, the State argued that the evidence was remote in time and did not establish a diagnosis for bipolar disorder, a mental disorder, or anything else that would entitle Garcia to a new trial.

¶ 20    At the hearing on the motion, trial counsel conceded that Garcia informed him that he received social security disability benefits prior to trial and acknowledged informing the court of that prior to trial. Counsel also admitted that he was aware of Garcia's "bipolar or schizophrenia condition" prior to trial and was aware of the BCX before he filed his appearance. Nevertheless, counsel argued that Garcia was entitled to a new trial because "there was new evidence that did

not come to light that he could have not known about at the time of trial." The court denied the motion and sentenced Garcia to consecutive prison terms of 25 years on each count, totaling 100 years.

¶ 21   On direct appeal, Garcia argued, in relevant part, that trial counsel was ineffective for failing to discover evidence regarding his mental health history prior to trial and take full advantage of it posttrial. This court affirmed, finding that the evidence against Garcia was overwhelming, and Garcia failed to establish he was prejudiced by counsel's failure to investigate his mental health history prior to trial. *Garcia*, 2023 IL App (1st) 172005, ¶ 56. We noted Garcia's mental health history was known to Garcia and counsel prior to trial, and Garcia's posttrial evidence regarding his mental health history was not newly discovered. *Id.* ¶¶ 49-52.

¶ 22   Garcia subsequently filed a *pro se* postconviction petition, arguing that he was not fit to stand trial and that he received ineffective assistance of "trial counsel."[1] Specifically, Garcia alleged that his low IQ and "extensive history of schizophrenia and psychosis" prevented him from understanding the nature of the criminal proceedings against him and assisting in his defense. He contended that the request for the BCX was "based on information that [he] provided to defense counsel that he had a history of mental illness." Yet, "[d]efense counsel" informed the court that he did not plan to introduce evidence regarding Garcia's mental health history, but also stated that Garcia was bipolar and was receiving social security disability benefits. Garcia argued that counsel's "testimony" and the evidence attached to the posttrial motion regarding Garcia's mental health history "raised a bonafide doubt" of his fitness to stand trial.

---

[1] Garcia's petition variously referred to "counsel," "trial counsel," and "defense counsel," but did not expressly distinguish between the APD who represented him pretrial and the retained attorney who represented him after the trial was continued, at trial, and on the posttrial motion.

¶ 23 Garcia also argued that "trial counsel" was ineffective for failing to conduct an adequate pretrial investigation into Garcia's mental health history and request a fitness hearing prior to trial or posttrial. Garcia alleged that "counsel" failed to discover the evidence and "take full advantage of it posttrial."

¶ 24 Garcia attached the same documents to his petition that were attached to his posttrial motion: a disability hearing officer decision from 2006, an individual treatment summary prepared by Blasius from January 2004, and a CPS psychological evaluation report from April 23, 2003, in addition to portions of the report of proceedings.

¶ 25 The disability decision reflected that a Social Security disability hearing was held on January 31, 2006. Garcia testified at the hearing that he was enrolled in special education services and had a learning disability but did not allege any additional impairments. Subsequent to the hearing, Garcia's mother submitted a CPS Individualized Education Program evaluation report from October 2005, which showed that Garcia was receiving "[Emotional Behavior Disorder/Learning Disability]," special education, and social work services.

¶ 26 In the decision, the hearing officer noted that a 2005 psychological evaluation established that Garcia had an "IQ of 70," placing him in the "lower half of the borderline range of intellectual functioning." The hearing officer observed that Garcia "testified very well on his own behalf," did not have a "problem comprehending any questions directed to him," had a "very good memory about basketball scores," his speech was "clear and understandable," and he "did not have any evidence of [a] mental problem." The hearing officer concluded that Garcia "currently [did] not retain the mental capacity to understand, remember and carry out the basic demands of simple,

unskilled work activities on a sustained basis day in and day out", and had "marked limitations in his ability to interact appropriately with co-workers and the general public."

¶ 27    The Individual Treatment Summary prepared by Blasius in January 2004 reflected that there were no records "on file" stating that Garcia had been hospitalized or prescribed medication, had a medical history, or had any current health concerns. There were also no records of a family history of mental illness. Garcia had been labeled as "EBD/LD" and received speech and language services in school. In spring 2002, Garcia was arrested and charged with attempted murder and possession of a weapon for which he received probation. Garcia functioned in the "low average of cognitive ability."

¶ 28    The CPS report of psychological evaluation reflected that Garcia was examined on April 23, 2003. Garcia's prior psychological evaluations indicated that he had "very low average to borderline cognitive functioning, with significant deficits in auditory/verbal processing, word retrieval, and auditory memory." During the examination, Garcia did not exhibit "attentional or concentration difficulties."

¶ 29    On May 20, 2022, the circuit court summarily dismissed Garcia's postconviction petition as frivolous and patently without merit. The court noted that the exhibits attached to the petition were more than 11 years old and irrelevant to Garcia's fitness to stand trial. Therefore, Garcia did not establish facts that existed at the time of trial to show a *bona fide* doubt of his fitness. The court found counsel's statements did not exhibit a *bona fide* doubt of Garcia's fitness "based upon their preparation" and that Garcia could "understand the nature and purpose of the proceedings and was able to assist in the defense." Counsel knew the difference between sanity and fitness and did not

perceive Garcia to be unfit to stand trial. Moreover, Garcia denied "any symptoms of psychosis or mania and none were observed" during his mental health intake screening.

¶ 30     Garcia filed a motion for leave to file a late notice of appeal on August 29, 2022, which this court allowed on September 20, 2022.

¶ 31     On appeal, Garcia argues that the circuit court erred in summarily dismissing his postconviction petition because he presented an arguable claim of ineffective assistance of trial counsel for failing to investigate and obtain documentation regarding his mental health history and request a fitness hearing.[2]

¶ 32     The Act allows a criminal defendant to challenge his or her conviction based on an alleged violation of federal or state constitutional rights. *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. The postconviction petition is not a substitute for an appeal from the conviction, but a collateral attack on the circuit court proceedings. *People v. Ealy*, 2024 IL App (1st) 221748, ¶ 30. A postconviction proceeding occurs in three stages. *People v. Huff*, 2024 IL 128492, ¶ 19. The circuit court here dismissed Garcia's petition at the first stage.

¶ 33     At the first stage, the court ascertains, without input from the State, whether the petition is frivolous or patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2020)), meaning it has "no 'arguable basis either in law or in fact' " (*People v. Smith*, 2023 IL App (1st) 221496, ¶ 33 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009))). A defendant need only present "the gist of a constitutional claim" with a limited amount of detail. *People v. Sparks*, 393 Ill. App. 3d 878, 883 (2009). At the first stage, the circuit court must take as true a petition's allegations unless they are

---

[2] As in his postconviction petition, Garcia's arguments in his briefs on appeal do not expressly distinguish between claims of ineffective assistance directed at the APD and retained counsel.

positively rebutted by the trial record. *People v. Toy*, 2013 IL App (1st) 120580, ¶ 18. If the court determines that a petition is frivolous and patently without merit, it must dismiss the petition. *Smith*, 2023 IL App (1st) 221496, ¶ 33. We review the first-stage dismissal of a postconviction petition *de novo*. *People v. Laney*, 2024 IL App (1st) 221129, ¶ 50.

¶ 34    As a threshold matter, the State argues that Garcia's claim of ineffective assistance of trial counsel for failing to investigate and obtain documentation regarding his mental health history and request a fitness hearing is procedurally forfeited because Garcia failed to raise it on direct appeal. We agree.

¶ 35    In an initial postconviction proceeding, issues are forfeited when an issue "could have been raised" on direct appeal and was not. *People v. Blair*, 215 Ill. 2d 427, 443-44. Generally, a postconviction petitioner can "avoid the procedural bar of forfeiture" by alleging ineffective assistance of appellate counsel for failing to raise the issue on direct appeal. *People v. Addison*, 2023 IL 127119, ¶ 23. However, a defendant's petition must provide specific allegations regarding appellate counsel's alleged ineffective assistance. See *People v. Shief*, 2016 IL App (1st) 141022, ¶ 54 (finding that the defendant forfeited a claim of ineffective assistance of appellate counsel when he failed to raise specific allegations regarding the claim in his postconviction petition). Claims of ineffective assistance of appellate counsel "cannot be inferred *** simply because issues of trial error were not raised on direct appeal." *People v. Cole*, 2012 IL App (1st) 102499, ¶ 13.

¶ 36    On appeal, Garcia concedes that his postconviction claim that trial counsel was ineffective for failing to investigate and obtain documentation regarding Garcia's mental health history and request a fitness hearing could have been raised on direct appeal. As Garcia points out, his attorneys "knew he had mental health and cognitive problems before trial, and could have obtained

supporting evidence of those issues had they properly investigated them." However, Garcia asserts that his failure to raise the ineffective assistance of trial counsel claim on direct appeal was due to the ineffective assistance of appellate counsel on direct appeal. Garcia further contends that this court can liberally construe his postconviction petition as asserting a claim of ineffective assistance of appellate counsel, citing *People v. Brown*, 236 Ill. 2d 175, 184, 188.

¶ 37     Garcia's *pro se* postconviction petition alleged trial counsel's ineffective assistance for failing to investigate Garcia's mental health history and request a fitness hearing. The petition did not, however, include any allegation regarding appellate counsel's failure to raise ineffective assistance of trial counsel on direct appeal, let alone that appellate counsel was ineffective for not doing so. Even with the most liberal construction of Garcia's petition, he did not raise a claim of ineffective assistance of appellate counsel on direct appeal.

¶ 38     Our supreme court has established that this court cannot in "its supervisory authority, *** excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition." *People v. Jones*, 213 Ill. 2d 498, 508 (2004). Because Garcia's postconviction petition did not assert a claim of ineffective assistance of appellate counsel on direct appeal, it cannot be raised for the first time on appeal. *Id.* at 505 ("[A] claim not raised in a petition cannot be argued for the first time on appeal."); *People v. Cole*, 2012 IL App (1st) 102499, ¶ 16 ("Because the defendant's postconviction petition makes no allegations against appellate counsel's performance on direct appeal, the defendant is precluded from asserting for the first time on appeal claims of ineffective assistance of appellate counsel never ruled upon by the circuit court."). Accordingly, at this juncture, forfeiture bars Garcia from asserting the claim that trial counsel was ineffective for failing to investigate and obtain

documentation regarding his mental health history and request a fitness hearing. *Blair*, 215 Ill. 2d at 443-44.

¶ 39    The judgment of the circuit court of Cook County is affirmed.

¶ 40    Affirmed.